Charles Avrith (SBN 96804)
NAGLER & ASSOCIATES
2300 S. Sepulveda Boulevard
Los Angeles, California 90064-1911
Telephone: (310) 473-1200
Facsimile: (310) 473-7144
Email: cavrith@nagler.com

*Attorneys for Plaintiffs America Unites for Kids and
Public Employees for Environmental Responsibility*

Paula Dinerstein (Pro Hac Vice Application Pending)
Public Employees for Environmental Responsibility
2000 P. Street NW, Ste. 240
Washington, DC 20036
Telephone: (202) 265-7337
Email: pdinerstein@peer.org

*Attorneys for Public Employees for Environmental Responsibility*

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| AMERICA UNITES FOR KIDS, and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,<br><br>Plaintiffs,<br><br>v.<br><br>SANDRA LYON, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE SANTA MONICA MALIBU UNIFIED SCHOOL DISTRICT, JAN MAEZ, IN HER OFFICIAL CAPACITY AS ASSOCIATE SUPERINTENDENT AND CHIEF FINANCIAL OFFICER OF THE SANTA MONICA MALIBU UNIFIED SCHOOL DISTRICT, AND | Case No. 2:15-CV-2124<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF TOXIC SUBSTANCES CONTROL ACT** |

1  LAURIE LIEBERMAN, DR. JOSE
2  ESCARCE, CRAIG FOSTER, MARIA
   LEON-VAZQUEZ, RICHARD
3  TAHVILDARAN-JESSWEIN,  OSCAR
4  DE LA TORRE, AND RALPH MECHUR,
   IN THEIR OFFICIAL CAPACITIES AS
5  MEMBERS OF THE SANTA MONICA
6  MALIBU UNIFIED SCHOOL DISTRICT
   BOARD OF EDUCATION,
7
8          Defendants.

9

10      Plaintiffs America Unites for Kids (formerly Malibu Unites) ("American

11 Unites") and Public Employees for Environmental Responsibility ("PEER"), on

12 behalf of themselves and their members, allege as follows:

13

14          **JURISDICTION, NATURE OF THE ACTION AND VENUE**

15      1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331

16 (federal question), 28 U.S.C. §2201 (declaratory judgment), and 15 U.S.C. §2619

17 (TSCA citizen suit provision).

18      2.    This is a citizen suit under the Toxic Substances Control Act

19 ("TSCA"), 15 U.S.C. §2619, seeking to restrain ongoing violations of TSCA and its

20 implementing regulations by the Defendants, administrators and members of the

21 Board of Education of the Santa Monica Malibu Unified School District

22 ("SMMUSD" or "District").  The ongoing violations of TSCA stem from the

23 continued use at Malibu Middle and High School ("MHS") and Juan Cabrillo

24 Elementary School ("JCES") (collectively "Malibu Schools") of polychlorinated

25 biphenyls ("PCBs") in caulk and other building materials at concentrations of

26 greater than 50 parts per million, other than in a totally enclosed manner, as well the

27 continued use of materials with surfaces having PCB concentrations in excess of 10

28 micrograms (ug) per 100 square centimeters ($cm^2$).

3.      Plaintiffs seek declaratory and injunctive relief requiring Defendants to cease ongoing violations of TSCA by removing all building materials which violate TSCA and its implementing regulations from the Malibu Schools.

4.      Venue is proper under 15 U.S.C. §2619(a)(2) because this is the district in which the alleged violations are ongoing, and in which Defendants have their principal place of business.

5.      Plaintiffs will also be filing a Motion for Preliminary Injunction, seeking immediate removal of caulk which has already been determined by laboratory testing to contain PCBs in excess of legal limits, and an application for Expedited Discovery under Fed. R. Civ. P. 34(a)(2) to enter the Malibu Schools and sample and test building materials to determine whether illegal levels of PCBs exist in those materials.

6.      Plaintiffs gave notice of the Administrator of the Environmental Protection Agency ("EPA") and the Defendants of the alleged violations more than 60 days prior to the filing of this Complaint, in accordance with 15 U.S.C. §2619(b) and 40 C.F.R. 702.62 (1982).

## PARTIES AND STANDING

7.      Plaintiff America Unites for Kids (formerly Malibu Unites) is a non-profit 501(c)(3) organization incorporated in California with members and supporters who are parents, teachers and community members at the Malibu Schools.  The mission of America Unites is to ensure environmental health excellence in schools for all children and those that educate them.  Members of America Unites are injured by the ongoing violations of TSCA at the Malibu Schools because they have children who attend school in classrooms with illegal levels of PCBs, which have been found to cause cancer and have other serious health effects, or because they have been forced to withdraw their children from the

1  Malibu Schools in order to avoid exposure to illegal levels of PCBs, or because they
2  teach in those classrooms.

3       8.    Plaintiff Public Employees for Environmental Responsibility (PEER) is
4  a non-profit 501(c)(3) educational and advocacy organization, incorporated in
5  Washington, D.C., which advocates for public employees concerned with
6  environmental issues, including the "Concerned Malibu/Cabrillo Teachers," a group
7  of 30 teachers and staff at the Malibu Schools.  Members of PEER, including
8  teachers and staff and the Malibu Schools, are injured by the ongoing violations of
9  TSCA at the Malibu Schools because they work in classrooms which have illegal
10  levels of PCBs, which have been found to cause cancer and have other serious
11  health effects.

12       9.    Defendant Sandra Lyon is the Superintendent of the SMMUSD, and is
13  engaged in ongoing violations of TSCA by permitting and failing to act to remedy
14  the unauthorized use of materials containing illegal levels of PCBs in the Malibu
15  Schools.  She is being sued in her official capacity.

16       10.    Defendant Jan Maez is the Associate Superintendent and Chief
17  Financial Officer of the SMMUSD, and is engaged in ongoing violations of TSCA
18  by permitting and failing to act to remedy the unauthorized use of materials
19  containing illegal levels of PCBs in the Malibu Schools.  She is being sued in her
20  official capacity.

21       11.    Defendants Laurie Lieberman, Dr. Jose Escarce, Craig Foster, Maria
22  Leon-Vazquez, Richard Tahvildaran-Jesswein, Oscar De La Torre and Ralph
23  Mechur are members of the SMMUSD Board of Education, and are engaged in
24  ongoing violations of TSCA by permitting and failing to act to remedy the
25  unauthorized use of materials containing illegal levels of PCBs in the Malibu
26  Schools.  They are being sued in their official capacities.

27  ///

28  ///

1 **LEGAL BACKGROUND**

2     12.    Congress enacted TSCA in 1976, 15 U.S.C. §2601 *et seq.,* to "regulate

3 chemical substances and mixtures which present an unreasonable risk of injury to

4 health or the environment." 15 U.S.C. §2601(b)(2).

5     13.    PCBs are the only chemical which Congress specifically identified for

6 regulation under TSCA. TSCA imposed a near-total ban on PCBs because

7 Congress determined that the chemical and toxicological properties of PCBs posed a

8 significant risk to public health and the environment. 15 U.S.C. §2605(e)(2)(A)

9 states:

10             Except as provided under subparagraph (B), effective one

11             year after the effective date of this Act [January 1, 1977]

12             no person may manufacture, process, or distribute in

13             commerce or use any polychlorinated biphenyl in any

14             manner other than in a totally enclosed manner.

15     14.    In TSCA, in subparagraph B referenced in the preceding quotation,

16 Congress gave EPA the authority to promulgate rules granting exceptions to the

17 statute's PCB ban, upon a finding that a particular manufacture or use of non-totally

18 enclosed PCBs "will not present an unreasonable risk of injury to health or the

19 environment." 15 U.S.C. §2605(e)(2)(B); §2605(e)(3)(B).

20     15.    TSCA requires that any EPA exceptions to its PCB prohibition be

21 promulgated in a rulemaking proceeding in accordance with the notice and comment

22 requirements of the Administrative Procedure Act (APA). 15 U.S.C. §2605(e)(4);

23 §2605(c)(2). Any exceptions to TSCA's PCB ban are judicially reviewable under

24 the APA and must be supported by substantial evidence. *E.g. Environmental*

25 *Defense Fund, Inc. v. EPA,* 636 F.2d 1267 (D.C. Cir. 1980).

26     16.    In the rules implementing TSCA's PCB ban ("PCB Regulations"), the

27 EPA Administrator found based on the documented scientific evidence that any use

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  of items containing PCBs at 50 ppm or greater <u>did</u> pose an unreasonable risk of

2  injury to health.  The Administrator found:

3             that the manufacture, processing, and distribution in

4             commerce of PCBs at concentrations of 50 ppm or greater

5             and PCB Items with PCB concentrations of 50 ppm or

6             greater <u>present an unreasonable risk of injury to health</u>

7             <u>within the United States.</u> <u>This finding is based upon the</u>

8             <u>well-documented human health and environmental hazard</u>

9             <u>of PCB exposure, the high probability of human and</u>

10            <u>environmental exposure to PCBs and PCB Items from</u>

11            <u>manufacturing, processing, or distribution activities;</u> the

12            potential hazard of PCB exposure posed by the

13            transportation of PCBs or PCB Items within the United

14            States; and the evidence that contamination of the

15            environment by PCBs is spread far beyond the areas where

16            they are used. . . .

17  40 C.F.R. 761.20 (emphasis added).

18        17.    "PCB Item" is defined in the PCB Regulations to mean "any PCB

19  Article, PCB Article Container, PCB Container, PCB Equipment, <u>or anything that</u>

20  <u>deliberately or unintentionally contains or has as a part of it any PCB or PCBs.</u>"  40

21  C.F.R. 761.3 (1999) (emphasis added).  "PCB Items" include PCB-containing

22  building materials such as caulk.

23        18.    40 C.F.R. 761.20(a) expressly provides that, except for certain limited

24  situations not applicable here, "[n]o person may use any PCB, or any PCB item

25  regardless of concentrations, in any manner, other than in a totally enclosed manner

26  within the United States unless authorized under [40 C.F.R. 761.30]."  40 C.F.R.

27  761.20(a) refers to 40 C.F.R. 761.3, which excludes from regulation PCB products

28

1  containing less than 50 ppm PCBs.  None of the exceptions in 40 C.F.R. 761.20(a)

2  apply to PCBs at concentrations greater than 50 ppm.

3      19.    Exclusions to the ban on the use of PCBs and PCB Items are also

4  found in 40 C.F.R. 761.30 (2012).  *See* 40 C.F.R. 761.20(a).  40 C.F.R. 761.30

5  (2012) contains exemptions for the use of materials containing PCBs in

6  concentrations of 50 ppm or greater which are not totally enclosed in limited

7  circumstances in uses such as in transformers and natural gas pipeline systems.  40

8  C.F.R. 761.30 (2012).  None of the exceptions permitting the use of materials

9  containing PCBs in concentrations of 50 ppm or greater applies to caulk or other

10  building materials.

11      20.    TSCA defines "totally enclosed manner" as a manner that "will ensure

12  that any exposure of human beings or the environment to a [PCB] will be

13  insignificant as determined by the Administrator rule." 15 U.S.C. §2605(e)(2)(C).

14  In the PCB Regulations, the EPA Administrator found that the exception from the

15  PCB ban for totally enclosed PCB Items applies only to situations where there is

16  zero exposure to humans or the environment.  40 C.F.R. 761.20 provides as follows:

17          For purposes of determining which PCB Items are totally

18          enclosed, pursuant to section 6(e)(2)(C) of TSCA, since

19          exposure to such Items may be significant, the

20          Administrator further finds that a totally enclosed manner

21          is a manner which results in no exposure to humans or the

22          environment to PCBs.

23  (emphasis added).  PCBs in caulk and other building materials result in exposure to

24  humans or the environment to PCBs.  Thus, the use of PCBs in caulk and other

25  building materials is not a use in a totally enclosed matter under TSCA.

26      21.    EPA has publicly confirmed that caulk and other building materials

27  containing PCBs at levels at or over 50 ppm are not authorized for use under the

28  PCB Regulations and must be removed and disposed of in accordance with those

1   Regulations.  EPA has consistently stated, "[t]he use of PCBs in caulk is not
2   authorized under TSCA's PCB regulations."  EPA, Facts about PCBs in Caulk,
3   www.epa.gov/pcbsincaulk/guide/guide-sect1.htm.

4       22.    The PCB Regulations applicable to materials containing 50 ppm or
5   greater PCBs also apply to "PCB Contaminated" materials which contain PCBs at
6   greater than 50 ppm or have surface PCB concentrations of greater than 10 ug per
7   100 cm$^2$.  40 C.F.R. 761.1(b)(3) (1999); 761.3.

8       23.    When PCBs are found at levels which violate the PCB Regulations,
9   they must be removed and disposed of in accordance with the PCB disposal
10  regulations.  40 C.F.R. 761.61 (2009); 41 C.F.R. 761.62 (2009).

11      24.    For PCB "Remediation Waste," which includes soil and building
12  materials contaminated with PCBs, the PCB disposal regulations include a site
13  characterization in which materials are sampled to identify the nature and extent of
14  the contamination.  40 C.F.R. 761.61(a)(3).  If PCB Remediation Waste is sought to
15  be disposed of in any manner not specifically prescribed by the regulation, an
16  application to do so must be approved by EPA upon a finding that "the method will
17  not pose an unreasonable risk of injury to health or the environment."

18      25.    If PCB "Bulk Product Waste," which includes PCB-containing caulk,
19  is sought to be disposed of in any manner not specifically prescribed by the
20  regulation, an application to do so must be approved by EPA upon a finding that
21  "the method will not pose an unreasonable risk of injury to health or the
22  environment."  40 C.F.R. 761.62(c)(2).

23      26.    There are no regulatory standards for PCB concentrations in indoor air.
24  Rather, the statutory and regulatory scheme is directed at prohibiting the
25  manufacture, distribution and continued use of materials containing PCBs, and
26  providing for their proper storage and disposal.  There are no exceptions to the
27  statutory and regulatory prohibitions based on whether or not, or to what extent,
28  PCB-containing materials are causing contamination of indoor air or dust.

27.    By informal means, such as posting on its website, EPA has created "suggested public health levels" for PCBs in indoor air in schools.  These suggested levels assume that there are not additional PCB exposures above background levels from dust, soil or outdoor air.  EPA has cautioned that the "suggested public health levels" should be used with "an appreciation of the uncertainty surrounding the estimates," and that they do not take into account direct ingestion or contact with contaminated building materials. EPA's "PCBs in Caulk – Q & A" http://www.epa.gov/pcbsincaulk/pdf/caulk_faq.pdf, p. 12 ¶¶ 38, 40.

28.    The "suggested public health levels" of PCBs for indoor air in schools have no regulatory basis and do not affect the statutory and regulatory scheme under TSCA which prohibits the continued use of any building materials containing PCBs in concentrations of 50 ppm or greater or surface concentrations of greater than 10 ug per 100 cm$^2$.

29.    Apart from having no regulatory basis, the "suggested public health levels" for PCBs in indoor air are not appropriate for use in Malibu because, among other reasons, they do not take into account the following: additional exposure pathways known to exist in Malibu, such as elevated concentrations of PCBs on building surfaces and in dust and outdoor soil; direct contact with (touching) and possible ingestion of materials containing PCBs by children; risks to the unborn children of pregnant teachers (the "suggested public health levels" are based on the age of the children in the classroom); and because they are based on levels of total PCBs and do not take into account exposure to far more toxic, dioxin-like congeners, which have been found in the Malibu Schools.

30.    TSCA makes it unlawful to fail to comply with its provisions or any regulation promulgated under the Act.  15 U.S.C. §§ 2614; 2689.  TSCA provides for civil penalties for such violations of not more than $25,000 for each day of violation, and for knowing and willful violations, in addition to or in lieu of the civil

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31.     TSCA provides for citizen suits against any person or entity alleged to be in violation of TSCA to restrain violations of the Act, which may be filed after at least 60 days' notice of the violation to the alleged violator and the Administrator of EPA.  15 U.S.C. § 2619.

32.     On January 12, 2015, Plaintiffs America Unites and PEER served a Notice of Intent to Sue the Defendants for ongoing violations of TSCA and its implementing regulations by the continued use at Malibu Middle and High School and Juan Cabrillo Elementary School of PCBs in caulking materials at concentrations of greater than 50 parts per million other than in a totally enclosed manner, as well the continued use of "PCB-Contaminated" materials.  The Notice of Intent to Sue was sent to the Defendants and the EPA by certified mail, return receipt requested.  A copy of the Notice, without exhibits, is attached hereto as Exhibit A.  The receipts which were returned to Plaintiffs evidence that the latest that any Defendant or the EPA received notice of Plaintiffs' intent to sue was January 20, 2015.

## FACTUAL BACKGROUND

### A.     Nature and Uses of PCBs

33.     Polychlorinated biphenyls (PCBs) belong to the family of man-made organic chemicals known as chlorinated hydrocarbons. PCBs were domestically manufactured from 1929 until their manufacture was banned by TSCA in 1976 because of their toxicity.  Due to their non-flammability, chemical stability, high boiling point, and electrical insulating properties, PCBs were used in hundreds of industrial and commercial applications including electrical, heat transfer, and hydraulic equipment; as plasticizers in paints, plastics, caulk, and rubber products; and in pigments, dyes, and carbonless copy paper.

34.     PCBs do not readily break down in the environment, but persist for long periods.  They volatilize from liquid and solid PCB-containing materials and cycle between air, water and soil.

35.     Although PCBs were no longer manufactured or distributed after 1979, due to their persistent nature, materials containing PCBs remain widespread to this day.  Materials such as caulk containing PCBs continue to have high levels of PCBs as long as 60 years after installation, and will continue to emit PCBs into the environment far into the future.

36.     In schools built before 1980, PCBs can be found in caulk, window glazing, florescent lighting ballasts, paint, joint sealants, ceiling tile coatings and other building materials.

37.     The PCBs used in these products are chemical mixtures made up of a variety of individual chlorinated biphenyl components, known as <u>congeners</u>. Aroclor is a trade name for common commercial mixtures of PCB congeners which were manufactured by Monsanto in the United States, and is the type of PCB product found in the Malibu Schools.

38.     PCBs in one material, for example, caulk, volatilize into the air and are absorbed by surrounding materials, causing wood, brick, concrete and other building materials to become contaminated with PCBs.  These secondary sources of PCBs can also volatilize and contaminate the air, dust, and other materials in the building. PCBs in buildings can also volatilize and be deposited into and contaminate surrounding soil.

39.     Exposure to PCBs can occur through inhalation, ingestion and dermal contact with PCB-contaminated building materials, air, dust and soil.

40.     Caulk and other building materials containing PCBs were used in schools mainly between 1950 and 1979.

**B.     Health Effects of PCBs**

41.     According to EPA, PCBs are probable human carcinogens, and cause adverse effects on the immune, reproductive, nervous and endocrine systems.  EPA, "Health Effects of PCBs," available at http://www.epa.gov/wastes/hazard/tsd/pcbs/pubs/effects.htm#Other.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

42.     In 2013, the International Agency for Research on Cancer (IARC) reassessed the carcinogenicity of PCBs. The Working Group, composed of 26 experts from 12 countries, considered more than 70 independent epidemiological studies. The Working Group classified PCBs as "known human carcinogens" on the basis of sufficient evidence of carcinogenicity to humans and experimental animals.

43.     Exposure to PCBs can cause liver toxicity, immunotoxicity, neurotoxicity, reproductive toxicity (including birth defects), developmental toxicity, endocrine disruption, disrupted insulin function, and changes in thyroid and steroid hormones.

44.     PCBs are a risk factor for autism and attention deficit-hyperactivity disorder and impaired cognitive function.

45.     A high level of PCBs in humans is also a risk factor for heart disease, hypertension and diabetes.

46.     Exposure to PCBs is also a risk factor for asthma and respiratory diseases.

47.     PCBs accumulate in the human body (bioaccumulate) and remain in the body for many years after exposure.

48.     PCB congener 126 is a dioxin-like chemical which is highly stable and resistant to biodegradation, and the most toxic of all of the PCB congeners. According to EPA's Regional Screening Levels, which attempt to compute PCB concentration levels protective of human health, PCB 126 is orders of magnitude more toxic than other PCB congeners and PCB commercial mixtures (Aroclors).

49.     PCBs are one of only 17 chemicals slated for elimination internationally by the Stockholm Convention on Persistent Organic Pollutants, ratified by 150 countries and entered into force in 2004.

**C.     History of PCBs at the Malibu Schools**

50.     In 2009 and 2010, the District conducted environmental reviews in connection with planned improvements on the Malibu High School campus.  As part

1 of these reviews, ARCADIS (the District's environmental consultant) reported to

2 the District that the soil in the Middle School Quad (located on the MHS campus)

3 was contaminated with PCBs at over 11 times the California Human Health

4 Screening Levels established by the California Environmental Protection Agency, as

5 well as with pesticides and other toxins.

6      51.    In 2010, ARCADIS concluded that the PCBs and pesticides in the soil

7 posed an "unacceptable health risk" and proposed a removal action plan.  "Removal

8 Action Workplan Malibu Middle and High School Campus Improvements Project,"

9 available at http://fip.smmusd.org/downloads/MalibuMHS_Removal.pdf

10      52.    This plan was carried out during the summer of 2011, while summer

11 school was in session. The District removed 48 truckloads of soil (1,179 cubic yards

12 weighing 1,158 tons) from the Middle School Quad, which, unbeknownst to parents

13 and teachers at the time, was contaminated with PCBs and pesticides.

14      53.    Neither ARCADIS nor the District attempted to determine the source

15 of the PCBs in the soil, or to test building materials to determine if they also

16 contained PCBs which may have migrated to nearby soils.

17      54.    In the two year period following the soil removal, three teachers then

18 working at the MHs campus were diagnosed with thyroid cancer - a disease with an

19 expected annual incidence of 1.29 per 10,000 Americans. As of today, at least three

20 student alumni have also been diagnosed with thyroid cancer. There are also at least

21 14 known cases of thyroid disease among teachers, and three cases of melanoma or

22 pre-melanoma (a cancer which is also associated with exposure to PCBs) among

23 teachers and former teachers, as well as other serious health problems.

24      55.    In October 2013, several teachers wrote to the District with concerns

25 that medical conditions they suffered may have been caused by the school

26 environment.  They pointed to three diagnoses of thyroid cancer among them within

27 the preceding six months, several other cases of thyroid disease, and cases of

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  migraines, rashes, hair loss, respiratory problems and bladder cancer.  The teachers

2  asked for environmental testing and for access to testing that had already occurred.

3      56.    Following the public revelation of these medical issues among teachers

4  and of the 2011 removal of toxic soil, in October 2013 a group of Malibu parents

5  hired a local environmental scientist to advocate for immediate testing of all of the

6  school rooms as well comprehensive soil testing. Although no comprehensive soil

7  testing was performed at that time, at the parents' insistence some of the school

8  rooms were tested.

9      57.    Also around that time, some of the classrooms in which teachers had

10  reported illnesses were vacated and those teachers and their students were sent to

11  other classrooms or facilities.

12      58.    The District employed Mark Katchen, with the Phylmar Group, to

13  conduct testing.

14      59.    In the initial testing in November 2013, ten rooms were tested for

15  PCBs in caulk and interior wall paint ("bulk samples"). These rooms were: the

16  Library (in the "Great White Building"); Rooms 1, 2, 5, 8 and 9 in the "Blue

17  Building" or Building E; Room 301 in the "Thresher Building," or Building F; and

18  Rooms 103, 104 and 105 in the Mako Building.  Building E is primarily a middle

19  school building; the Library, Building F, the Thresher Building and the Mako

20  Building are used for both middle school and high school classes.

21      60.    An Environmental Task Force formed by the District including parents

22  and teachers selected these rooms because of their proximity to where PCBs had

23  been found in the soil by ARCADIS.  The intent was to test the hypothesis that

24  building materials were the source of the PCBs in the soil.  The test results appeared

25  to confirm this hypothesis.

26      61.    The Phylmar Group originally calculated a Malibu-specific screening

27  level for cancer from PCBs in indoor air in order to reach a one in one million risk

28  level (*i.e.* there would be one excess cancer out of a million people exposed to PCBs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1 at this level for the amount of time students and teachers spend in classrooms) of
2 20.2 nanograms (ng) per cubic meter for staff and 63.7 ng per cubic meter for
3 students. (The level for staff was lower because they spend more time in the
4 classrooms). The Task Force agreed to use 20.2 ng as an action-level threshold for
5 the Malibu Schools.

6      62.     However, after receiving some test results of PCBs higher than 20.2 ng
7 per cubic meter of air, the District unilaterally changed the screening level to 100 ng
8 without any input or agreement from the Task Force. Months later, on January 27,
9 2014, EPA changed the threshold to use 200 ng per cubic meter as a health guideline
10 for indoor air at the Malibu Schools. EPA's suggested threshold was based on a
11 calculation for a school in New York City with significantly different conditions
12 from those in Malibu.

13      63.     <u>All</u> of the caulk and paint samples from these rooms contained some
14 level of PCBs. Four of the ten tested rooms had caulk samples with levels above the
15 regulatory threshold of 50 ppm. The rooms testing above the regulatory limit were
16 Rooms 1, 5 and 8 in Building E ("Blue Building") and the Library.

17      64.     Out of 30 wipe (surface) samples in the ten tested rooms, <u>all</u> had some
18 level of PCBs detected. Four wipe samples had PCBs at levels deemed "PCB
19 Contaminated" under the PCB Regulations, *i.e.* above 10 micrograms per 100
20 square centimeters. These samples all came from window sills in Rooms 1 and 5 in
21 Building E ("Blue Building"), Room 301 (Thresher Building) and the Library. All
22 of these rooms with the exception of Room 301 also had levels of PCBs in caulk
23 exceeding the regulatory limit of 50 ppm.

24      65.     In addition, air samples from the same ten rooms were tested for PCBs.
25 <u>All</u> of the air samples showed some level of PCBs well above outdoor background
26 levels. The highest level in these ten rooms was close to 100 ng of PCBs per cubic
27 meter of air.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

66.     The initial samples were tested for all 209 PCB congeners.  Most wipe and bulk samples and many air samples contained PCB 126, the most highly toxic of the PCB congeners.

67.     The three teachers with thyroid cancer all taught in classrooms with toxic illegal levels of PCB in caulk or with wipe samples considered "PCB Contaminated" under the PCB Regulations.

68.     On November 21, 2013, Steve Armann of EPA Region 9's PCB program wrote to Defendant Sandra Lyon, Superintendent of the District, informing the District that a PCB clean-up plan would be required which included "Removal and disposal of caulk material and any other source(s) of PCBs present at the school."

69.     The initial test results indicated that there was some source of PCBs in all of the ten tested rooms in four different buildings in MHS, which was causing PCBs to be found in all of the air and wipe samples at well above background levels. Levels in caulk above regulatory thresholds were found in five out of ten tested rooms (four with over 50 ppm in caulk and one with over 10 ug per 100 cm$^2$ in a wipe sample).  All these results indicated the likelihood of widespread violations of TSCA throughout the Malibu Schools.  However, the District has since steadfastly refused to test any more caulk or other building materials in the Malibu Schools to determine the scope and extent of contamination requiring remediation under TSCA.

70.     Instead, since December 2013, the District has tested only air and dust in selected rooms throughout the Malibu Schools.  It is impossible to determine from air and dust tests whether PCBs in caulk or other materials exceed the regulatory threshold of 50 ppm or greater than 10 ug per 100 cm$^2$.  However, the initial tests of building materials, as well as later independent testing, indicate that illegal PCBs are found throughout the Malibu Schools; in some cases at many times the levels found in  the initial testing.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

71.     The District's testing of air and dust revealing the presence of PCBs in many rooms evidences that there is a source of PCBs in those rooms which could be above TSCA limits, and in fact is highly likely to be above TSCA limits where the same type of caulk in the same building tested above legal limits.

72.     In December 2013, the District conducted cleaning and pre-and post-cleaning air and wipe testing in 21 classrooms, including the ten tested previously. These rooms were in the Building E ("Blue Building"), Building F ("Thresher Building"), the Great White Building where the Library is located, the Mako Building, and a faculty office located near the boys' locker room for the gym, which is used by both the Middle and High Schools.   Despite the fact that the District's consultant left the windows open in several of the tested rooms, thus diluting the PCBs in the samples, all of the tested rooms showed some level of PCBs in the air significantly in excess of outdoor levels, as well as PCBs in all of the wipe samples, both pre- and post-cleaning, indicating that there is a source of PCBs in all of these 21 rooms in five different buildings in MHS.

73.     In February 2014, the District retained the firm Environ International (Environ) as its consultant on chemical contamination issues in the Malibu Schools.

74.     On April 25, 2014, Environ submitted to EPA its draft "Comprehensive PCB-Related Building Materials Inspection, Management and Removal Plan for the Santa Monica-Malibu Unified School District" (hereinafter "First Environ Plan")  In that Plan, Environ, on behalf of the District, proposed to remove caulk determined to contain PCBs in concentrations above the regulatory standard of 50 ppm in the Library and rooms 1, 5 and 8 only in connection with the demolition or renovation of the buildings in which those rooms are located, even though no such demolitions or renovations were then scheduled.  Environ, again on behalf of the District, proposed to "manage in place" those PCBs and other suspected PCB-containing materials in the interim. Management in place would

1  consist of general school cleaning and repair or removal only of visibly deteriorating
2  caulk.

3      75.    The First Environ Plan provided for sampling of building materials
4  and soils to determine the nature and extent of the presence of PCBs, but only
5  immediately prior to any renovation or demolition the District might conduct at an
6  unknown time in the future.  If such sampling prior to renovation or demolition
7  revealed PCBs in excess of regulatory limits, then a site-specific remediation plan
8  would be created at that time to govern removal and appropriate disposal of PCB-
9  containing materials from the buildings about to be renovated or demolished.  The
10 First Environ Plan did not provide for any testing of building materials, air, or dust
11 during the "manage in place" period prior to renovation or demolition.

12     76.    On June 4, 2014, EPA rejected the First Environ Plan.  EPA asked for
13 the submission within 30 days of two separate plans – one for Malibu High School
14 and one for schools District-wide.  EPA demanded a schedule to actually remove
15 caulk containing 50 ppm or greater concentrations of PCBs, and asked for the
16 addition to the plan of periodic air and wipe testing pending removal.

17     77.    On July 3, 2014, Environ submitted on behalf of the District its "Site-
18 Specific, PCB-Related Building Materials Management, Characterization and
19 Remediation Plan" for the Library and Building E rooms 1, 5 and 8" (hereinafter
20 "Second Environ Plan.")  Despite EPA's demand for a schedule to actually remove
21 illegal PCBs, the Second Environ Plan continued the proposal in the First Environ
22 Plan to remove and dispose of the illegal caulk and other building materials only
23 when renovations or demolitions of the buildings occurred at an unknown time in
24 the future.  The Second Environ Plan merely added a provision that removal would
25 occur within 15 years, if that were sooner than renovation or demolition, with the
26 possibility of requesting an extension of the 15-year timeframe.

27     78.    The Second Environ Plan provided for no further testing of caulk or
28 other materials, except in conjunction with building renovation or demolition, or in

1   conjunction with caulk removal when more than 15 years had elapsed without
2   renovation or demolition.

3      79.   Prior to such future removal of caulk and other contaminated
4   materials, management in place would take place through cleaning (as with the First
5   Environ Plan), with the addition of air and wipe sampling in selected rooms over a
6   one year period.  EPA has never approved or disapproved the Second Environ Plan.

7      80.   On July 17, 2014 Plaintiffs PEER and America Unites (then Malibu
8   Unites) submitted comments on the Second Environ Plan, asserting that the Plan
9   was in violation of TSCA and of EPA's specific directions for the Plan.  Along with
10  their comments, PEER and Malibu Unites submitted results from independent
11  testing for PCBs from an EPA-certified laboratory. (First Set of Independent Tests).
12  The first room to be tested in JCES, Room 19, Building F, had 340,000 ppm PCBs
13  in the caulk,  thousands of  times higher than the highest level of 1,870 ppm
14  previously found in the Library and nearly seven thousand times the regulatory limit
15  of 50 ppm.  The woodshop room in the High School Angel Building had caulk in
16  the door frame which tested even higher – at 370,000 ppm PCBs.

17     81.   Ironically, Room 19 in JCES was one to which a sixth grade teacher
18  and her students had been moved during the previous school year to protect them
19  from exposures in a Middle School room which contained caulk only modestly
20  above the 50 ppm legal threshold.  The District had touted its "protective" action
21  which in fact moved this teacher and students to a then-untested room with
22  thousands of times more PCBs.

23     82.   The independent testing also showed that caulk in the office near the
24  boys' locker room in MHS exceeded regulatory standards at 190 ppm, and dirt
25  samples showed PCB levels as much as 11 times higher than EPA's regional
26  screening guide in MHS Rooms 1, 2 and 5 in Building E (the Blue Building).

27
28

83.     In sum, the First Set of Independent Tests found three rooms with caulk exceeding legal limits, with two of them in the hundreds of thousands ppm PCBs.

84.     PCBs above regulatory limits had now been found in four different buildings at all three Malibu Schools – the Elementary, Middle and High Schools.

85.     Over the summer of 2014, Environ carried out its plans to clean and test air and dust in many of the rooms at the Malibu Schools.  No caulk or other building materials (bulk samples) were tested.

86.     Unlike the earlier testing by the Phylmar Group, Environ did not test all of the PCB congeners, but only total PCBs.  Also, Environ used a detection level of approximately 70 ng per cubic meter for air tests, thus producing numerous "non-detect" results which do not in fact indicate that there were no PCBs in the air.  The earlier testing was able to detect PCBs in outdoor air at 1.23 ng per cubic meter.  Its lowest detection in indoor air was around 3 ng per cubic meter.

87.     As noted above, the earlier testing found PCBs in indoor air above outdoor background levels in all tested rooms, indicating a source of PCBs in those rooms.  The Environ testing avoided such findings by setting the detection level much higher.  Environ's detection level of 70 ng per cubic meter was not far below EPA's health guideline of 100 ng per cubic meter for children ages 3 to 6.  As noted above, EPA has cautioned that it suggested health guidelines for PCBs in air should be used with "an appreciation of the uncertainty surrounding the estimates."

88.     While Environ claimed to "clear" for occupation all of the Malibu School buildings based on its air and dust sampling, its findings did not determine whether or not there were regulatory exceedances in the rooms tested.  For example, Room 19 at JCES, which had 340,000 ppm total PCBs in caulk and 122 ppm PCB 126, more than two <u>million</u> times above the EPA health screening guideline, was cleared for occupancy by elementary school children.  Because Environ did not test

1  for individual PCB congeners, it is not known how much of the PCBs which were

2  detected in the air of Room 19 were PCB 126.

3      89.    When rooms tested above EPA guidelines for PCBs in air and dust,

4  Environ simply re-cleaned the rooms until a reading below the EPA guidelines

5  could be obtained.  In two rooms, the woodshop room in MHS and an office at

6  JCES, this did not succeed, and those rooms were closed off, though rooms all

7  around them, likely built with the same caulk and other building materials, remained

8  open regardless of whether they had been tested in any form.

9      90.    In a December 2014 Report on its sampling and cleaning efforts over

10  the summer of 2014, Environ reported that it had tested air and dust in 30 to 60% of

11  regularly occupied rooms either pre- or post-cleaning.  It stated that the tested rooms

12  were expected to be representative of the non-sampled regularly occupied rooms

13  because they had the same construction history, similar potentially PCB-impacted

14  building materials and similar functions and usage patterns.  Thus, Environ

15  concluded that conditions in the rooms not tested were not expected to be different

16  from those that were tested.

17      91.    The same reasoning would apply to rooms where caulk was tested and

18  found to be above legal limits; the same results should be expected in other rooms

19  with the same construction history and similar PCB-impacted building materials,

20  *e.g.* caulk.

21      92.    In many cases, the cleaning conducted by Environ for the District over

22  the summer of 2014 actually increased the levels of PCBs in the air.  Cleaning

23  decreased PCB air concentrations only in a small percentage of cases.  Environ

24  reported that 21% of air samples collected at the same location both pre- and post-

25  cleaning had increased levels of PCBs after cleaning, 67% remained the same, and

26  only 12% decreased.

27

28

93.     Environ reported that the levels of PCBs in dust samples increased post-cleaning in 5% of the samples, decreased in 26% of the samples and 68% stayed non-detect.

94.     Thus, the "best management practices" cleaning conducted by the District actually causes PCBs in the air to increase or stay the same most of the time, while removing dust succeeds in reducing PCB levels in dust more often than it raises those levels, although it is not known how temporary the improvement is, *i.e.* how soon PCB-laden dust is redeposited.

95.     Based on repeated testing in other schools such as those in New York City, it has been shown that air and dust levels of PCBs are highly variable over even short periods of time – any particular test only gives a snapshot that could change substantially from day to day.

96.     In Environ's testing over the summer of 2014, an area of soil near the woodshop room also exceeded regulatory standards for PCBs in soil.  It was fenced off and a soil removal action subsequently took place under the supervision of the California Department of Toxic Substances Control.  The source of PCBs in that soil was not determined; however the nearby woodshop room had the highest level of PCBs in caulk found in the independent tests discussed above.

97.     On August 12, 2014, Plaintiff America Unites submitted to the District a Memorandum containing "Recommendations for PCB Investigation at Malibu Middle & High" which contained a plan for thorough testing and remediation throughout the Malibu Schools.  This plan was never acknowledged or followed.

98.     Also on August 12, 2014 at a public gathering, Cindy Crawford and her husband, who were MHS parents, offered to pay for full testing of all of the caulk at the Malibu Schools.  The District did not accept their offer.

99.     When school re-opened in late August 2014, teachers were threatened with firing if they did not re-occupy rooms in which caulk or wipe samples had tested above regulatory limits.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

100.   A first grade student whose parents did not want her to attend specialty classes in a room in Building F of JCES which had tested with extremely high levels of PCBs in caulk was threatened with truancy.

101.   Although EPA had neither approved nor disapproved the Second Environ Plan to leave PCBs in violation of TSCA in place for 15 years or more, on August 14, 2014, a District official sent an email to an EPA Region 9 PCB official stating that the District would remedy the TSCA violations identified at "four window areas" by June 30, 2015. The District official stated that this was a "voluntary corrective agreement." The email also stated: "Additionally should we find additional TSCA regulated materials, we anticipate voluntary removal of those materials and will coordinate with the EPA regarding any necessary approvals and timing." However, the District did not reference or agree to remove the caulk that had already been found to be in violation of TSCA in independent tests in additional rooms; nor did it provide any plans to "find additional TSCA regulated materials."

102.   Also on August 14, 2014, EPA Region 9 Administrator Jared Blumenthal wrote a letter to Sandra Lyon, Superintendent of the District. The letter "acknowledge[d] the District's plan to remove the caulk" from four windows by June 30, 2015. The letter also stated that "EPA concurs with this approach," and that EPA did not recommend "additional testing of caulk unless dust or air samples persistently fail to meet EPA's health-based guidelines." The letter did not address the extremely high levels of PCBs, up to thousands of times the legal limit, that had been identified in independent testing, or that many other rooms where caulk had not been tested were likely to exceed legal limits based on the fact that rooms in the same building, likely built with the same caulk, had exceedances.

103.   In September 2014, additional independent test results from an EPA-certified laboratory were submitted to EPA and the District. (Second Set of Independent Tests). Four additional rooms in MHS where caulk had not been

1  previously tested were found to exceed regulatory limits, with two of these in the

2  hundreds of thousands of ppm PCBs.

3      -- Room 401 in the Leopard Building had 146,000 ppm PCBs.

4      -- Room 505 in the Angel Building had 231,000 ppm PCBs.

5      -- Room 205 in the Mako Building had 200 ppm PCBs

6      -- Room 7 in Building E (Blue Building) had 190 ppm.

7      104.   The Second Set of Independent Tests also included a piece of caulk

8  which was retrieved from a walkway on the MHS campus after it fell out of a trash

9  bag being hauled by a worker towards the High School parking lot to a car labeled

10  "air duct cleaning." This was apparently part of a surreptitious caulk removal effort

11  which was not reported to the community or to EPA to ensure compliance with

12  protective practices and disposal regulations.  This caulk also tested above the legal

13  limit at 58 ppm.

14      105.   At this point, every building on the MHS campus (six buildings) and

15  the only building on the JCES campus where caulk had been tested had exceedances

16  of the regulatory limit, indicating the likelihood that many more as yet untested

17  rooms in all of the pre-1980 school buildings have regulatory exceedances.

18      106.   On September 26, 2014, Environ submitted by email a letter to EPA

19  Region 9 PCB official Steve Armann on behalf of the District regarding

20  "Supplemental Removal Information for the Library, Building E – Rooms 1, 5 and

21  8, and Building G, Room 506 at Malibu High School" (hereinafter "Environ

22  Supplement").  The letter stated that it was intended to supplement and modify the

23  Second Environ Plan.  The document clarified that the four window areas referenced

24  in the District's August 14, 2014 email as having TSCA violations were four

25  windows in the Library, and Rooms 1, 5 and 8.  It also stated the District's intention

26  to implement a similar remedy for the interior doorframes in the woodshop room,

27  Room 506.  (Room 506 was the room identified in independent testing as having

28  370,000 ppm PCBs in the caulk in the interior door frame, though Environ's letter

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   did not acknowledge this).  The letter noted that wipe samples from the doorframe

2   exceeded the regulatory standard of 10 ug per hundred $cm^2$ even after repairs and

3   additional cleaning.

4        107.   The Environ Supplement stated the District's current intention to

5   physically remove and replace caulk only from the four window units and one

6   doorframe.  It did not extend even to caulk in other windows and doors in the same

7   rooms.  However, the letter also committed to the same procedures for other

8   buildings in the District where 50 ppm or greater PCBs are "identified and verified

9   in building materials," within one year of identification and verification.  However,

10   the Supplement did not acknowledge or address the findings in the independent tests

11   of caulk exceeding legal limits.

12        108.   In October 2014, America Unites asked the laboratory to re-run the

13   caulk from the two rooms with the highest PCB concentrations (JCES Room 19 and

14   the High School woodshop room) for all of the PCB congeners, and then

15   specifically for congener 126, the most toxic of all of the PCB congeners.  The

16   samples had previously been analyzed only for total PCBs.  These new tests found

17   the presence of congener 126 at 122 ppm in Juan Cabrillo Room 19 and 57 ppm in

18   the woodshop – up to more than three million times more toxic than the EPA health-

19   based Regional Screening Level  which provides for PCB 126 concentrations in the

20   low parts per *trillion* to provide an acceptable level of cancer risk.

21        109.   In December 2014, additional test results were received by America

22   Unites and submitted to EPA and the District showing regulatory exceedances in

23   four more rooms in JCE and two more rooms in the MHS.  (Third Set of

24   Independent Tests).  These results were also resubmitted to the Defendants with the

25   Notice of Intent to Sue on January 12, 2015.

26      ■     MHS Room 704  had 4,700 ppm PCBs in caulk an a door frame in a

27   hallway

28      ■     JCES Room 22 had 74,000 ppm PCBs in interior window caulk

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1     ■    JCES Room 18 had 110,000 ppm PCBs in interior window caulk

2     ■    A JCES office had 710 ppm PCBs in interior window caulk

3     ■    JCES Room 23 had 17,000 ppm PCBs in interior window caulk

4     110.   Neither EPA, nor the District, nor its contractor Environ ever

5 responded to the submission of the three sets of independent test results or created a

6 plan to remediate these thirteen additional rooms, six of which had extremely high

7 levels of PCBs in caulk -- four in the hundreds of thousands of ppm, and two in the

8 tens of thousands ppm.

9     111.   At the present time, there are known to be 17 rooms in six different

10 buildings in MHS and two different buildings in JCES with PCBs in caulk above 50

11 ppm.

12     112.   On October 6, 2014, Plaintiffs PEER and Malibu Unites wrote to

13 Superintendent Lyon asking for clarification of the September 26, 2014 Environ

14 Supplement.  Specifically, Plaintiffs asked "what information the District needs to

15 'identify and verify' the presence of PCBs above TSCA limits," and whether the

16 District would accept and act upon the independent test results that showed at least

17 twelve additional rooms with caulk above TSCA limits.  The letter also requested

18 that if those independent test results were considered deficient, the District specify

19 with particularity in what manner they were deficient.  Finally, the letter asked if the

20 District would "accept and execute the [August 12, 2014] testing plan provided to

21 them by Malibu Unites and Cindy Crawford to test all three schools? This plan takes

22 one weekend to execute and 10 days to produce preliminary results. If not, please

23 specify with particularity as to why the district will not identify and verify all PCB

24 sources in the three schools."  To date, Plaintiffs have received no response to this

25 letter.

26     113.   On October 31, 2014, EPA approved under 40 C.F.R. 761.61 <u>only</u> the

27 portion of the Second Environ Plan and Environ Supplement regarding the PCBs

28 remaining in the substrate (known as PCB Remediation Waste) after removal of

1    PCB-containing caulk in the four rooms slated for caulk removal by June 2015.

2    EPA approved Environ's plan to seal and encapsulate porous substrates underneath

3    the removed caulk and within one foot of it, and to decontaminate non-porous

4    substrates with a solvent, until renovation or demolition occurs.  The District is

5    required to continue best management practices cleaning and periodic air and wipe

6    samples for at least a year and to take further action if exceedances of EPA's health

7    guidelines occur. Full remediation and disposal of the PCB Remediation Waste in

8    accordance with the PCB Regulations would occur at the time of renovation or

9    demolition.

10         114.   Therefore, even with respect to materials in proximity to caulk testing

11   in excess of regulatory limits, the District will not be identifying and removing

12   materials in violation of TSCA prior to renovation or demolition at an unknown

13   time in the future.

14         115.   Over winter break in December 2014 and January 2015, Environ

15   conducted additional air and dust sampling at the Malibu Schools.  Again, no caulk

16   or other building materials were tested.

17         116.   As with its testing the previous summer, Environ did not test for the

18   individual congeners of PCBs, and used a detection level of approximately 70 ng per

19   cubic meter for air tests, thus producing numerous "non-detect" results which do not

20   in fact indicate that there were no PCBs in the air.

21         117.   Just before the winter break, from December 16-19, 2014, the

22   SMMUSD sent in a "special crew" to clean and wipe down surfaces in the Malibu

23   Schools.  This special cleaning concluded just 24 hours prior to the beginning of

24   Environ's testing of air and dust for PCBs, which took place between December 20

25   and 29, 2014.

26         118.   This special cleaning was intended to reduce the amount of PCBs in air

27   and dust in the samples about to be collected, such that those samples would not

28   accurately reflect the exposures that students and teachers actually experienced in

1   the time period since the last testing and cleaning the previous summer of 2014, and
2   to make it appear that EPA's health guidelines for air and dust samples had been
3   met, even if conditions prior to the special cleaning did not meet those guidelines.

4        119.   Despite this pre-cleaning effort, two rooms had dust samples above
5   EPA's threshold – the old gymnasium in MHS and Room 19 in JCES, the latter of
6   which independent test results had shown to have extremely high levels in the caulk.
7   (The old gymnasium had never had caulk tested, either by the District or
8   independently).

9        120.   The District then performed additional cleaning in these two rooms.  In
10  the case of JCES Room 19, four samples remained above EPA guidelines, and a
11  second re-cleaning was done, finally obtaining results below the guidelines.  The air
12  in this room was not tested until after the second re-cleaning.

13       121.   On January 12, 2015, Plaintiffs served the Notice of Intent to Sue in
14  this case.  Return receipts from certified mail evidence that Defendants received this
15  Notice at the latest by January 20, 2015.

16       122.   On February 27, 2015, the District sent an email message to the parents
17  and staff of the Malibu Schools.  The message stated, among other things, that the
18  District had been made aware of third party sampling revealing the existence of
19  caulk above the 50 ppm TSCA threshold.  In fact, the District had been aware of
20  independent testing showing extremely high illegal levels of PCBs for over seven
21  months, since July 2014.

22       123.   The District's February 27, 2015 email then claimed that it had not
23  been able to confirm the exact locations where these samples were taken.  However,
24  the Plaintiffs had supplied the District with information identifying the rooms and
25  locations where the samples were taken, and the District had reported in September
26  2014 that it had sampled air and dust in some of the same rooms that were
27  independently tested, specifically identifying those rooms, revealing that it in fact
28  had no problem identifying the rooms where the independent samples were taken.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

124.   The District's February 27, 2015 email stated that the District would proceed with "verification sampling of locations from which caulk appears to have been removed and sampled," and apply its removal plan to any PCBs found in excess of the TSCA threshold.  However, the District supplied no information as to which rooms it would test or when it would do so, and did not state any intention to test additional caulk or other building materials in pre-1980 buildings at the Malibu Schools to determine the nature and extent of PCB contamination.

125.   As of February 2015, the District had spent or committed to spend approximately four million dollars in connection with the contamination issues at the Malibu Schools.  This money was spent for environmental consultants, lawyers, and public relations consultants, without ever remedying the ongoing violations of TSCA by removing any caulk or other building materials with illegal levels of PCBs.

126.   District and independent tests of a relatively small percentage of the rooms at the Malibu Schools have demonstrated the illegal continued use of caulk above legal limits in 17 rooms in ten different buildings, all built before 1979.

127.   District testing of air and dust has also demonstrated the presence of PCBs at well above background levels in the environments of many more rooms at the Malibu Schools, which indicates the presence of PCBs in the caulk and other building materials in those rooms.

128.   Caulk and other building materials in the same buildings or buildings built during the same time period with the same or similar building materials as those where illegal levels of PCBs have been found also contain illegal levels of PCBs.

## CAUSE OF ACTION

129.   Plaintiffs re-allege and incorporates all of the preceding paragraphs.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

130.   By continuing an unauthorized use and failing to remove and properly dispose of building materials with PCBs at or above 50 ppm or with surface concentrations above 10 ug per 100 $cm^2$ at the Malibu Schools, the Defendants have violated TSCA, 15 U.S.C. 2605(e)(2) and 15 USC §2614(1); and its implementing regulation at 40 CFR §761.20(a).

131.   Plaintiffs are authorized to bring this action to restrain a violation of TSCA, and the Court is authorized to provide declaratory and injunctive relief by 15 U.S.C. § 2619.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Defendants have violated TSCA by continuing the unauthorized use of and failing to remove building materials containing 50 ppm or more PCBs or which have surface concentrations of PCBs above 10 ug per 100 $cm^2$ from the Malibu Schools;

B.     Issue preliminary and permanent injunctive relief requiring Defendants to (i) cease all use of caulk and other materials at the Malibu Schools containing PCBs at concentrations of 50 ppm or greater or having surface concentrations of PCBs above 10 ug per 100 $cm^2$; (ii) comprehensively test all caulk and other building materials in the Malibu Schools for PCBs at concentrations over 50 ppm or surface concentrations of PCBs above 10 ug per 100 $cm^2$; (iii) promptly remove all building materials containing 50 ppm or more PCBs or which have surface concentrations of PCBs above 10 ug per 100 $cm^2$ from the Malibu Schools; and (iv) dispose of such materials in accordance with the TSCA Regulations;

C.     Award Plaintiffs costs, expert witness fees, testing costs, and attorneys' fees in accordance with 15 U.S.C.  §2619(e); and

1       D.   An award of any other relief the Court deems appropriate.

2

3    Dated: March 23 , 2015          NAGLER & ASSOCIATES

4

5                                    By: _____

6                                          Charles Avrith

7                                    *Attorneys for Plaintiffs America Unites for*
                                     *Kids and Public Employees for*
8                                    *Environmental Responsibility*

9

10   Dated: March 23 , 2015

11

12                                   By: _____

13                                         Paula Dinerstein
                                     *Attorneys for Plaintiff Public Employees for*
14                                   *Environmental Responsibility*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF