UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICA UNITES FOR KIDS, et al., | No. CV 15-2124 PA (AJWx) |
| Plaintiffs, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| SANDRA LYON, et al., | |
| Defendants. | |

The Court, sitting without a jury, conducted a bench trial on May 17, 2016.

Following the Court Trial, the Court ordered the parties to submit proposed Findings of Fact and Conclusions of Law.  Pursuant to the Court's instructions, the parties reviewed the other side's proposed Findings of Fact and Conclusions of Law and marked them to indicate the particular factual assertions and legal conclusions they agreed with and those they disputed, and also filed their reasons for their objections.  (Dkt. Nos. 300, 303, and 304.)  The facts that are in dispute on which the Court relies in reaching its conclusion are supported by the record.  Unless otherwise noted, where evidence is subject to an evidentiary objection, and the Court has relied on that evidence, the Court has overruled the evidentiary objection for the reason or reasons identified by the party offering the evidence in response

to the other side's objection.  Where the Court has refused to consider evidence subject to an objection, the Court will indicate the basis for sustaining the evidentiary objection.  All other evidentiary objections to evidence that the Court has not relied on or cited in these Findings of Fact and Conclusions of Law are denied as moot.

After reviewing the evidence, the parties' objections to that evidence, and the parties' pre-trial and post-trial submissions, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).  Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

## I.   **Findings of Fact**

1.      Defendants Sandra Lyon and Janece Maez are the Superintendent and Assistant Superintendent of the Santa Monica-Malibu Unified School District (the "District").  Defendants Laurie Lieberman, Dr. Jose Escarce, Craig Foster, Maria Leon-Vasquez, Richard Tahvildaran-Jesswein, Oscar de La Torre and Ralph Mechur are members of the District's Board of Education.  Defendants Lyon, Maez, Lieberman, Escarce, Foster, Leon-Vasquez, and Tahvildaran-Jesswein will be referred to collectively as "Defendants."

2.      The District operates Juan Cabrillo Elementary School ("JCES") and Malibu Middle and High School ("MHS") (collectively the "Malibu Campus") in Malibu, California.

3.      Plaintiff America Unites for Kids ("America Unites") is a non-profit organization that has as its mission to ensure environmental health excellence in schools for all children and those who support them.  America Unites advocates for the removal of polychlorinated biphenyls ("PCBs") from schools.  (Dkt. No. 250 (J. DeNicola Test.) at 1:7-14.)

4.      America Unites' members and officers include parents of students who attend classes at the Malibu Campus.  (Dkt. No. 250 (J. DeNicola Test.) at 1:2-22.)

5.      As alleged in the First Amended Complaint ("FAC"), plaintiff Public Employees for Environmental Responsibility ("PEER"), is a non-profit organization that advocates for public employees concerned with environmental issues.  The only evidence in support of PEER's standing submitted at trial is the Declaration of Katy Lapajne, who describes herself as a "supporter" of PEER and is a teacher at MHS.  (Dkt. 249 (Lapajne Test.) at 1:2-7.)  PEER's Articles of Incorporation and Bylaws, plaintiffs' Exhibits 44 and 45, to which Defendants have filed an evidentiary objection, were not properly introduced or authenticated through any witness testimony.  (Dkt. No. 300, Trial Exhibit ("Ex.") 2, 2:3-17.)  The Court therefore sustains Defendants' evidentiary objections to Exhibits 44 and 45.

6.      The following buildings at MHS were constructed in 1963:  Building A (800, Great White Shark, Library), B/C (900, Whale Shark, Administration), D (100 & 200, Mako Shark), E (000, Blue Shark), F (300, Thresher Shark), G (500, Angel Shark), H (Cafeteria/Auditorium), I (400, Leopard Shark), and J (700, Old Gymnasium).  (Ex. 548, p. 36 (Table 1-1).)

7.      At JCES, Building A was constructed in 1958; Building B was constructed in 1955; Building C was constructed in 1957; Building D was constructed in 1958; Building E was constructed in 1965; and Building F was constructed between 1961 and 1965.  (Id.)

8.      Until the enactment of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601-2695d, banned their manufacture and use in the late 1970s, PCBs were used in numerous applications, including as a plasticizing agent in caulking and glazing materials.

9.      In the Fall of 2013, the District retained Mark Katchen, a founder and Managing Principal with the Phylmar Group, Inc., to assist in the evaluation of environmental concerns raised at the Malibu Campus.  (Dkt. No. 226 (Daugherty Test.) at 29; Dkt. No. 230 (Katchen Test.) at 5.)

10.     The Phylmar Group tested ten rooms at MHS for PCBs.  Four of the ten rooms tested had caulk samples with PCB levels above the regulatory threshold of 50 ppm: (1)

-3-

MHS Building A, Library (1,870 ppm); (2) MHS Building E Room 1 (164 ppm); (3) MHS Building E, Room 5 (98.7 ppm); and (4) MHS Building E, Room 8 (52.8 ppm).  (Ex. 531, p. 19 (Table 3) & p. B1.)

11.     In January 2014, the Environmental Protection Agency ("EPA") instructed the District to prepare a comprehensive work plan to investigate and assess PCBs at the Malibu Campus, which included "removal of all caulk with known concentrations above 50 ppm PCBs" discovered to date, as well as "mitigation or removal of any caulk that is deteriorating in pre-1979 structures" at the Malibu Campus.  (Ex. 522 (January 27, 2014 EPA Correspondence).)

12.     The District hired Ramboll Environ US Corporation, previously known as ENVIRON International Corporation ("Ramboll Environ"), in early 2014 with a team led by Principal-in-Charge Doug Daugherty, to conduct environmental services at the District's schools, including services related to PCBs.  (Daugherty Test., Dkt. No. 226, at ¶¶ 2 & 4.)

13.     In April of 2014, Ramboll Environ developed and published a Comprehensive PCB-Related Building Materials Inspection, Management, and Removal Plan ("Comprehensive Plan") for the District to address investigation of potential building materials impacted by PCBs, establish a Best Management Practices ("BMP") program to ensure the Malibu Campus was properly cleaned to manage potential PCB exposures, and plan for removal of potential building materials impacted by PCBs during renovations. (Dkt. No. 225 (MacIntosh Test.) at ¶ 58; Dkt. No. 226 (Daugherty Test.) at ¶ 32; Ex. 529.)

14.     The Comprehensive Plan was submitted to EPA Region IX via e-mail from Doug Daugherty to Steve Armann on April 25, 2014.  (Dkt. No. 226 (Daugherty Test.) at ¶ 59; Ex. 529.)

15.     On June 4, 2014, EPA issued a letter responding to the Comprehensive Plan submittal.  The EPA stated that the Comprehensive Plan required significant restructuring, and recommended that the District move forward with the BMPs as described in the Comprehensive Plan, stating that "the 'PCB Best Management Practices' contained in the [Comprehensive] Plan do not require EPA approval, and we recommend that the District

1   move forward with these activities at MHS." (Dkt. No. 226 (Daugherty Test.) at ¶ 64-65;

2   Ex. 530 (June 4, 2014 EPA Correspondence).)

3       16.     Ramboll Environ submitted to EPA on July 3, 2014, the Site-Specific

4   PCB-Related Building Materials Management, Characterization and Remediation Plan for

5   the Library and Building E Rooms 1, 5, and 8 at Malibu High School (the "Site-Specific

6   Plan"). The Site-Specific Plan included the parameters for a Pilot Study for air and wipe

7   sampling to evaluate the potential for human exposure to PCBs at the Malibu Campus and

8   the efficacy of the BMPs undertaken by the District. (Dkt. No. 226 (Daugherty Test.) at ¶¶

9   32 & 34; Ex. 531 (Site-Specific Plan).)

10      17.     The Site-Specific Plan covered the management practices associated with the

11  potential for PCB-containing materials at the Malibu Campus, specifically addressing the

12  removal of caulk at locations in the Library and in MHS Building E Rooms 1, 5, and 8, and

13  the BMPs the District would implement until the removal of the caulk. (Dkt. No. 226

14  (Daugherty Test.) at ¶ 71; Ex. 531 (Site-Specific Plan).)

15      18.     The Site-Specific Plan committed to EPA that caulk around four windows in

16  Room 801 of Building A (the Library) and Rooms 1, 5, and 8 of Building E would be

17  removed and provided the steps and procedures that would be used during the removal.

18  (Dkt. No. 226 (Daugherty Test.) at ¶ 71; Ex. 531 (Site-Specific Plan).)

19      19.     In a letter from EPA Region IX Administrator Jared Blumenfeld to Sandra

20  Lyon dated August 14, 2014 (the "August 14, 2014 EPA Correspondence"), EPA explained

21  its concurrence with the Site-Specific Plan's approach for removal of certain caulk at the

22  Malibu Campus by June 30, 2015, and its concurrence with the air and wipe sampling Pilot

23  Study as submitted to EPA. (Dkt. No. 226 (Daugherty Test.) at ¶¶ 26, 38, 72; Ex. 541

24  (August 14, 2014 EPA Correspondence).)

25      20.     EPA confirmed that, based on EPA's observation of the Summer 2014 Pilot

26  Study sampling work, the air and wipe testing work performed by the District "was

27  consistent with EPA's national guidance" and that "EPA does not recommend additional

28  testing of caulk unless dust or air samples persistently fail to meet EPA's health-based

guidelines." (Dkt. No. 225 (MacIntosh Test.) at ¶ 58; Dkt. No. 226 (Daugherty Test.) at ¶¶ 26, 38, 72; Ex. 541 (August 14, 2014 EPA Correspondence).)

21. On September 26, 2014, Ramboll Environ, on the District's behalf, submitted the Supplemental Removal Information for the Library, Building E - Rooms 1, 5, and 8, and Building G, Room 506 at Malibu High ("Removal Supplement") to EPA Region IX.  (Dkt. No. 226 (Daugherty Test.) at ¶ 73; Ex. 544 (Removal Supplement).)

22. In February 2015, Ramboll Environ tested a total of 24 caulk samples in ten rooms in five different buildings at the Malibu Campus.  All 24 samples had PCBs over the 50 ppm regulatory limit, with most over 100,000 ppm, and measurements up to 570,000 ppm.  In some rooms, the district sampled multiple areas, all demonstrating levels of PCBs above 50 ppm.  The following table summarizes the result of the District's testing.

| Room | Ramboll Environ Results (ppm) |
|---|---|
| **MHS** <br> Building E, Room 3 | 1,600 <br> 1,800 |
| Building E, Room 7 | 330 <br> 1,800 |
| Building G, Room 505 | 220,000 |
| Building I, Room 401 | 190,000 |
| Building J, Room 704 (inside office) | 4,500 <br> 1,800 <br> 1,500 |
| Building J, Room 704 (hallway) | 3,800 |
| **JCES** <br> Building F, Room 18 | 290,000 <br> 270,000 <br> 230,000 |
| Building F, Room 19 | 390,000 <br> 570,000 <br> 560,000 |

| | |
|---|---|
| Building F, Room 22 | 290,000<br>470,000<br>220,000<br>138,000 |
| Building F, Room 23 | 350,000<br>440,000<br>280,000<br>180,000 |

(Ex. 554, p. 9 (Table 3).)

23.     The testing conducted by the Phylmar Group and Ramboll Environ revealed PCBs in caulk above the 50 ppm threshold in each of the six buildings constructed at the Malibu Campus prior to 1979 that were tested.  Out of 20 total rooms where the District tested caulk, 14 had PCBs above the 50 ppm threshold-containing.  Of the 34 samples tested by the District, 28 had PCBs in excess of the 50 ppm threshold.

24.     On March 20, 2015, Ramboll Environ submitted a Notification of Additional Locations at Malibu High School and Juan Cabrillo Elementary School to be Addressed in Accordance with October 2014 Approved Plan ("March 2015 Notification") to EPA Region IX on the District's behalf.  (Dkt. No. 225 (MacIntosh Test.) at ¶ 59; Dkt. No. 226 (Daugherty Test.) at ¶ 76; Ex. 554 (Notification of Additional Locations).)

25.     The March 2015 Notification committed to EPA that, in addition to the removal activities described in the Site-Specific Plan and Removal Supplement, caulk would be removed within one year at locations within MHS Building E Rooms 3 and 7; MHS Building G Room 505; MHS Building I Room 401; MHS Building J (Old Gym) Rooms 704 and 704 Hallway; and JCES Building F Rooms 18, 19, 22, and 23.  (Dkt. No. 226 (Daugherty Test.) at ¶ 77; Ex. 554 (Notification of Additional Locations).)

26.     On March 23, 2015, Ramboll Environ notified EPA of its report of data from the Winter 2014/2015 break sampling event in the 2014/2015 Winter Break PCB Sampling Report for MHS and JCES ("March 2015 Pilot Study Report").  (Dkt. No. 226 (Daugherty Test.) at ¶ 50; Ex. 553 (Winter Break PCB Sampling Report).)

27.     During the Winter 2014/2015 school break sampling, 100% of the air samples and 88% of the wipe samples did not detect PCB concentrations above the laboratory's method reporting limit.  (Dkt. No. 226 (Daugherty Test.) at ¶ 50; Ex. 553 (Winter Break PCB Sampling Report).)

28.     On March 23, 2015, Plaintiffs commenced this action by filing their Complaint against Defendants alleging a single claim for violation of TSCA.  (Dkt. No. 1 ("Complaint").)  Plaintiffs filed their First Amended Complaint ("First Amended Complaint") for declaratory and injunctive relief under the TSCA on April 1, 2015.  (Dkt. No. 12.)

29.     In accordance with the Site-Specific Plan, Removal Supplement, and March 2015 Notification, during the Summer 2015 school break, Ramboll Environ oversaw the completion of removal activities (the "Summer 2015 PCB Removal Activities") at the locations described in the Site-Specific Plan, Removal Supplement, and March 2015 Notification.  (Dkt. No. 219 (Herrmann Test.) at ¶ 18; Dkt. No. 222 (Rohr Daniel Test.) at ¶ 23; Dkt. No. 226 (Daugherty Test.) at ¶ 79; Dkt. No. 228 (Pacheco Test.) at ¶ 6.)  The Summer 2015 PCB Removal Activities included the physical removal of caulk; decontamination of non-porous surface materials adjacent to the caulk and performance of post-decontamination wipe sampling; preparation and encapsulation of porous substrate that had previously been in contact with caulk up to one foot away from caulk/substrate contact and performance of post-encapsulation wipe sampling; and post-removal confirmatory air and wipe sampling to ensure compliance with population-applicable EPA's Exposure Levels for Evaluating PCBs in Indoor School Air and EPA Region IX surface wipe benchmark for the Malibu Campus (i.e., 1 $\mu$ g/100 cm$^2$) in the rooms where removal work was undertaken.  (Dkt. No. 219 (Herrmann Test.) at ¶ 18; Dkt. No. 222 (Rohr Daniel Test.) at ¶ 23; Dkt. No. 226 (Daugherty Test.) at ¶ 79; ECF No. 228 (Pacheco Test.) at ¶¶ 10, 13.)

30.     The caulk described in the Site-Specific Plan, Removal Supplement, and March 2015 Notification was physically removed by the District's contractor, Castlerock Environmental, Inc., under the oversight of the Ramboll Environ team.  (Dkt. No. 219

1 (Herrmann Test.) at ¶¶ 16, 18; Dkt. No. 222 (Rohr Daniel Test.) at ¶¶ 21, 23; Dkt. No. 226
2 (Daugherty Test.) at ¶ 81; Dkt. No. 228 (Pacheco Test.) at ¶¶ 9-16.)

3    31.   Caulk was removed by: (1) sealing off the area of the room where caulk
4 removal was to occur to create a containment area so that debris from the removal would not
5 escape to other areas; (2) physically scraping out the caulk in the removal area; (3) properly
6 disposing of the removed caulk and debris; (4) cleaning the areas from which caulk was
7 removed to ensure no caulk debris remained; and (5) encapsulating any remaining porous
8 substrate that had come into contact with the removed caulk pursuant to EPA approvals.
9 (Dkt. No. 219 (Herrmann Test.) at ¶¶ 16, 18; Dkt. No. 222 (Rohr Daniel Test.) at ¶¶ 21, 23;
10 Dkt. No. 226 (Daugherty Test.) at ¶ 81; Dkt. No. 228 (Pacheco Test.) at ¶¶ 9-14.)

11   32.   These removal activities were completed by June 30, 2015.  (Dkt. No. 226
12 (Daugherty Test.) at ¶¶ 72, 74; Dkt. No. 228 (Pacheco Test.) at ¶¶ 5, 15.)

13   33.   Following the removal activities, pursuant to the EPA-approved Site-Specific
14 Plan and Removal Supplement and as described above, any area of the affected rooms where
15 porous substrate had come into contact with the removed caulking was encapsulated and any
16 area of the affected rooms where non-porous substrate had come into contact with the
17 removed caulking was decontaminated.  (Dkt. No. 219 (Herrmann Test.) at ¶ 18; Dkt. No.
18 222 (Rohr Daniel Test.) at ¶ 23; (Dkt. No. 226 (Daugherty Test.) at ¶ 83; Dkt. No. 228
19 (Pacheco Test.) at ¶ 11.)

20   34.   The Ramboll Environ field team also conducted confirmatory air and wipe
21 sampling following the caulk removal activities to ensure that exposure levels in the rooms
22 where the Summer 2015 PCB Removal Activities occurred remained below the applicable
23 EPA's Exposure Levels for Evaluating PCBs in Indoor School Air.  (Dkt. No. 219
24 (Herrmann Test.) at ¶ 18; Dkt. No. 222 (Rohr Daniel Test.) at ¶ 23; Dkt. No. 226 (Daugherty
25 Test.) at ¶ 84; Dkt. No. 232 (Bowie Test.) at ¶ 22.)

26   35.   Encapsulation and confirmatory sampling was completed in the Summer of
27 2015.  (Dkt. No. 226 (Daugherty Test.) at ¶ 84.)

28

36.     On October 5, 2015, after the Summer 2015 Pilot Study sampling event was concluded in the Summer of 2015, the District submitted to EPA Region IX a letter along with Ramboll Environ's report entitled Conclusion of PCB Sampling Pilot Study and 2015 PCB Removal Activities Report for Malibu High School and Juan Cabrillo Elementary School ("October 2015 Report"), which together certified the completion of the Summer 2015 PCB Removal Activities and reported the results of the Summer 2015 Pilot Study sampling event.  (Dkt. No. 225 (MacIntosh Test.) at ¶ 60; Dkt. No. 226 (Daugherty Test.) at ¶ 51; Ex. 562 (Appendix D, October 2015 Report); Ex. 564 (October 2015 Report).)

37.     As described in the October 2015 Report, Ramboll Environ undertook final post-removal confirmatory sampling in each room where removal activities were undertaken which indicated that PCB concentrations were below EPA Region IX's surface wipe benchmark for the Malibu Campus of 1 µg/100 cm2 for dust and below population-applicable EPA's Exposure Levels for PCBs in Indoor School Air, confirming that the Summer 2015 PCB Removal Activities were successfully completed.  (Dkt. No. 226 (Daugherty Test.) at ¶¶ 51, 84, 85; Ex. 559 (Building Materials Guidance) at p. 14.)

38.     In addition, during the Summer 2015 Pilot Study sampling, 100% of the air samples and 99% of the wipe samples did not detect PCB concentrations above the laboratory's method reporting limit.  (Dkt. No. 226 (Daugherty Test.) at ¶ 51; Ex. 562 (Appendix D, October 2015 Report); Ex. 564 (October 2015 Report).)

39.     In response to the October 2015 Report, EPA issued a letter to the District on November 2, 2015, concluding that EPA "determined that the removal work, BMPs, and air and wipe sampling were performed consistent with EPA's national guidelines to protect public health from PCBs in schools and the terms and conditions of the [October 31, 2014] Approval."  (Dkt. No. 226 (Daugherty Test.) at ¶ 86; Ex. 566 (November 2, 2015 EPA Correspondence).)[1]

---

[1]     Plaintiffs objected to the statements in the November 2, 2015 Correspondence. Because the evidence is not being offered for the truth, the Court overrules the hearsay objection.

40.     EPA reiterated its prior conclusion that it "does not believe that there is a need for additional testing of potential PCB source materials until planned renovation or demolition" of the pre-1981 buildings at the Malibu Campus.  (Dkt. No. 226 (Daugherty Test.) at ¶ 86; Ex. 566 (November 2, 2015 EPA Correspondence).)

41.     Based on the air and wipe data to date from the Malibu Campus, EPA concluded that any "PCB remediation wastes remaining in place at MHS and JCES do not pose an unreasonable risk of injury to health or the environment" and that "conditions at both schools continue to meet EPA national guidelines to protect public health from PCBs in schools."  (Dkt. No. 226 (Daugherty Test.) at ¶ 86; Ex. 566 (November 2, 2015 EPA Correspondence).)[2]

42.     The District is currently undertaking modernization projects at the Malibu Campus utilizing funds from two Board of Education-approved bond measures that will result in the removal and replacement of all pre-1979 windows and doors at MHS and JCES and their surrounding caulk.  (Dkt. No. 227 (Maez Test.) at ¶¶ 5, 12.)[3]

43.     As part of these modernization projects, and in keeping with the Comprehensive Plan and EPA policy and guidance, the District will properly characterize building materials undergoing renovation or demolition, prior to disposal of these materials,

_____

[2]     Plaintiffs objected to the statements in the November 2, 2015 Correspondence. Because the evidence is not being offered for the truth, the Court overrules the hearsay objection.

[3]     Plaintiffs objected to the testimony of Janece Maez concerning the District's renovation plans for the Malibu Campus on relevance, hearsay, and best evidence grounds. Maez is the District's Associate Superintendent and Chief Financial Officer.  (Dkt. No. 227 (Maez Test.) at ¶ 2.)  In this role, she manages the budget for any construction project undertaken by the District, is responsible for disbursements of funding associated with bond measures, and meets regularly concerning construction projects, including those at the Malibu Campus.  (Id. at ¶¶ 2-15.)  The fact that the District is undertaking to remove and replace all pre-1979 windows and doors at MHS and JCES is relevant to the scope and timing of any injunctive relief the Court might grant.  The Court overrules the other evidentiary objections to Maez's testimony as the statements are based upon her personal knowledge.

that are planned to occur at the Malibu Campus over the next several years.  (Dkt. No. 226 (Daugherty Test.) at ¶ 87; Ex. 529 (Comprehensive Plan) at 34.)

44.     The Comprehensive Plan sets forth detailed procedures to be followed once a planned building renovation or demolition is scheduled.  (Ex. 529 (Comprehensive Plan) at 36.)  Similarly, the Specific Plan (Ex. 531) and Removal Supplement (Ex. 544) inform the process for renovation and management of Potentially PCB-Impacted Building Materials that will be subject to remediation.

45.     Measure BB is a District-wide bond measure in the amount of $268 million, which was passed in 2006.  (Dkt. No. 227 (Maez Test.) at ¶ 5.)

46.     With respect to the Malibu Campus, Measure BB bond money was set aside for a campus improvement project to modernize MHS.  (Dkt. No. 227 (Maez Test.) at ¶ 5.)

47.     Measure ES is a District-wide bond measure in the amount of $385 million, which was passed in 2012 to "repair, modernize, construct and acquire classrooms," to ensure school earthquake and fire safety, and to upgrade technology.  (Dkt. No. 227 (Maez Test.) at ¶ 5.)

48.     As part of that bond measure, an allocation of approximately $77 million was reserved for improvements to schools located in Malibu, including MHS and JCES.  (Dkt. No. 227 (Maez Test.) at ¶ 5.)

49.     The Measure BB project at the Malibu Campus, which has already received its required approval from the Division of the State Architect ("DSA"), will result in modernization of a significant portion of MHS.  (Dkt. No. 227 (Maez Test.) at ¶ 6.)

50.     As part of the approved Measure BB project, Building A (Library and computer labs) and Buildings B and C (Administrative Offices) will be completely demolished and replaced with a new two-story building providing seven new general classrooms and three new science labs for the middle school program; two computer labs; a library with a high-tech classroom and multi-media center; and administrative offices and support spaces.  (Dkt. No. 227 (Maez Test.) at ¶ 6.)

51.     In addition, Building E will be renovated to provide two new and ten modernized classrooms for the middle school program, and one classroom in Building E will be converted into a modernized Faculty Lounge.  (Dkt. No. 227 (Maez Test.) at ¶ 6.)

52.     As part of the modernization of Building E, all windows will be replaced with energy-efficient windows, and all doors that have not been upgraded during the past 25 years will be replaced.  (Dkt. No. 227 (Maez Test.) at ¶ 6.)

53.     The window and door replacement will entail removal of the entire window system and/or door and surrounding caulk in an affected room, re-framing, and installation of a new window system and/or door with new caulk.  (Dkt. No. 227 (Maez Test.) at ¶ 6.)

54.     The classrooms in Building E will also be re-painted, and any floor coverings that have not been replaced in the past 25 years will be modernized.  (Dkt. No. 227 (Maez Test.) at ¶ 6.)

55.     The Measure BB project at MHS, which has been planned for several years and which is now able to move forward following the resolution of certain land use issues, is scheduled to begin after the 2015/2016 school year ends in June 2016 with construction of temporary relocatable classrooms on the Malibu Campus.  (Dkt. No. 227 (Maez Test.) at ¶ 7.)

56.     The District has undertaken the necessary administrative processes to permit these classrooms for construction in the limited space available on campus to house them. (Dkt. No. 227 (Maez Test.) at ¶ 7.)

57.     These portables will hold students and staff who will be moving from Buildings A, B, C, and E when school resumes in the Fall of 2016.  (Dkt. No. 227 (Maez Test.) at ¶ 7.)

58.     Demolition and construction activities associated with the Measure BB project are currently scheduled to commence this year, and to be completed by 2020.  (Dkt. No. 227 (Maez Test.) at ¶ 7.)

59.     Students will return to new Buildings A, B, and C, and modernized Building E, upon completion of the project.  (Dkt. No. 227 (Maez Test.) at ¶ 7.)

60.     Because there are pre-1979 buildings on the MHS campus other than Buildings A, B, C, and E that have not had windows, doors, or floors replaced in the past 25 years, the District has formulated a plan to take advantage of the fact that construction will already be ongoing on the MHS campus to undertake modernization projects in Buildings D, F (Orchestra/Band), G (Special Education/Woodshop), H (Cafetorium), I (Visual Art), and J (Old Gymnasium) as part of a District-wide "Windows, Paint, Floors, and Doors" program that is being administered with the use of Measure ES bond money.  (Dkt. No. 227 (Maez Test.) at ¶ 8.)

61.     The Windows, Paint, Floors, and Doors program identified a number of campuses District-wide that would benefit from modernization of window systems, paint, floors, and doors in their classrooms.  (Dkt. No. 227 (Maez Test.) at ¶ 8.)

62.     All pre-1979 windows in Buildings D, F, G, H, I, and J will be replaced with new, energy-efficient windows.  (Dkt. No. 227 (Maez Test.) at ¶ 8.)

63.     As with the modernization of Building E, the window replacement will entail removal of the entire window system and surrounding caulk, re-framing, and installation of a new window system with new caulk.  (Dkt. No. 227 (Maez Test.) at ¶ 8.)

64.     In addition, walls will be re-painted, floor coverings that have not been replaced in the past 25 years will be modernized, and doors that have not been replaced in the past 25 years will be replaced.  (Dkt. No. 227 (Maez Test.) at ¶ 8.)

65.     As with windows, door replacement will entail removal of the entire door and frame, re-framing, and installation of a new door with new caulk.  (Dkt. No. 227 (Maez Test.) at ¶ 8.)

66.     The modernization of Buildings D, F, G, H, I, and J is scheduled to begin during 2017, and to be completed by 2020.  (Dkt. No. 227 (Maez Test.) at ¶ 9.)

67.     In addition to the activities that are planned at MHS, modernization activities will be taking place at JCES during 2016 as part of the Windows, Paint, Floors, and Doors program.  (Dkt. No. 227 (Maez Test.) at ¶ 10.)

68.     JCES is one of the first campuses to be modernized under the Windows, Paint, Floors, and Doors program.  (Dkt. No. 227 (Maez Test.) at ¶ 10.)

69.     Starting once the Summer 2016 school break commences in June of 2016, all pre-1979 window systems at the JCES campus will be replaced with new, energy-efficient windows.  (Dkt. No. 227 (Maez Test.) at ¶ 11.)

70.     This primarily affects the window systems in Building F at that school, as most doors and windows throughout the remainder of the JCES campus were modernized in the 1990s.  (Dkt. No. 227 (Maez Test.) at ¶ 11.)

71.     In addition to the window replacement in Building F, all windows and doors that have not been replaced within the past 25 years will be replaced, all floor coverings that have not been replaced within the past 25 years will be modernized, and classrooms will receive a fresh coat of paint.  (Dkt. No. 227 (Maez Test.) at ¶ 11.)

72.     As with the modernization projects at MHS, the window and door replacement will entail removal of the entire window system and/or door and frame and surrounding caulk in any impacted room, re-framing, and installation of a new window system and/or door with new caulk.  (Dkt. No. 227 (Maez Test.) at ¶ 11.)

73.     These activities are expected to be fully completed by January of 2017, and the window replacement activities are expected to be completed by the time school resumes at JCES for the Fall 2016 semester.  (Dkt. No. 227 (Maez Test.) at ¶ 11.)

74.     The Measure BB and ES projects at MHS and the Measure ES-funded Windows, Paint, Floors, and Doors project at JCES, scheduled to be completed by 2020, will address all pre-1979 windows and doors and surrounding caulking at the Malibu Campus. (Dkt. No. 227 (Maez Test.) at ¶ 12.)

75.     The District is already engaging in the necessary administrative processes to ensure that these projects move forward on schedule.  (Dkt. No. 227 (Maez Test.) at ¶ 13.)

76.     The District hired an architect to begin designing the Windows, Paint, Floors, and Doors project at JCES, including replacement of the windows in Building F, in October of 2015.  (Dkt. No. 227 (Maez Test.) at ¶ 13.)

77.     Architectural plans were submitted to DSA on March 18, 2016, a window contractor, JEC, Inc., was hired in March of 2016, and bids for the general contractor were opened on April 12, 2016 and will be awarded on May 5, 2016.  (Dkt. No. 227 (Maez Test.) at ¶ 13.)

78.     The work is, as discussed above, slated to begin during the Summer 2016 school break.  (Dkt. No. 227 (Maez Test.) at ¶ 13.)

79.     With respect to the projects planned for MHS, the District already has an existing DSA approval for the Measure BB project to replace Buildings A, B, and C and to modernize Building E.  The District plans to hire a contractor by the end of the 2016 calendar year to do this work.  (Dkt. No. 227 (Maez Test.) at ¶ 13.)

80.     With respect to the Windows, Paint, Floors, and Doors projects to be undertaken at MHS, the District plans to select an architect within the next two months.  (Dkt. No. 227 (Maez Test.) at ¶ 13.)

## II.   **Conclusions of Law**

### A.   **Jurisdiction and Venue**

1.     This Court has jurisdiction over Defendants and America Unites in this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), and 15 U.S.C. § 2619 (TSCA citizen suit provision).  Dkt. No. 218-1 at p. 2:20-22.

2.     PEER has not established it has organizational standing sufficient to maintain this lawsuit against Defendants, as set forth in Hunt v. Washington Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977) ("[A]n association has standing to bring suit on behalf of its members when:  (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").  The party invoking federal jurisdiction bears the burden of establishing these elements.  See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215,

231, 110 S. Ct. 596, 608, 107 L. Ed. 2d 603 (1990).  Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883-889, 110 S. Ct. 3177, 3186-89, 111 L. Ed. 2d 695 (1990); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 114-15 & n.31, 99 S. Ct. 1601, 1615-16, 60 L. Ed. 2d 66 (1979).  The Declaration of Katie Lapajne, who identifies herself as a "supporter" of PEER, but not a member, does not establish the necessary facts to support's PEER's associational standing to pursue the claims it has asserted in this action.  Nor has PEER submitted any other admissible evidence concerning its members or if any such members would have the right to bring this action in their own right. Because PEER has not met its burden to establish its standing to pursue its claim in this action, the Court lacks subject matter jurisdiction over PEER's claim and dismisses PEER's claim without prejudice. Fleck & Assocs., Inc. v. Phoenix, 471 F.3d 1100, 1106 (9th Cir. 2006) (explaining that lack of standing is a jurisdictional issue requiring dismissal without prejudice).

3.      Venue is proper in this district under 15 U.S.C. § 2619(a)(2) because this is the district in which the alleged violations are ongoing, and in which Defendants have their principal place of business.  (Dkt. No. 218-1 at p. 2:22-25.)

**B.      Toxic Substances Control Act**

4.      PCBs are regulated pursuant to the TSCA and its implementing regulations at 40 C.F.R. § 761.

5.      The EPA was authorized by the United States Congress to implement TSCA at 15 U.S.C. § 2601(c).

6.      EPA was authorized by Congress to promulgate rules as follows:  "Within six months after January 1, 1977, the Administrator shall promulgate rules to-(A) prescribe methods for the disposal of PCBs, and (B) require PCBs to be marked with clear and adequate warnings, and instructions with respect to their processing, distribution in

1   commerce, use, or disposal or with respect to any combination of such activities."  15 U.S.C.

2   § 2605(e)(1).

3       7.      EPA promulgated regulations regarding PCBs pursuant to TSCA.  See 40 CFR

4   § 761.

5       **C.      Elements of TSCA Claim**

6       8.      To establish a violation of the TSCA pursuant to the citizen suit provision at

7   15 U.S.C. § 2619, America Unites must show:

8           a.      The material or substance at issue constitutes a chemical, substance, or

9                   mixture that is regulated under TSCA; and

10          b.      Defendants' handling of the material or substance constitutes an

11                  ongoing violation of a TSCA statutory provision or a regulation

12                  promulgated pursuant to such a provision.

13  (Dkt. No. 218-1 at p. 4:11-17.)

14      9.      With respect to the PCBs alleged to be in issue in this matter, to establish a

15  violation of the citizen suit provision of the TSCA pursuant to the implementing regulations

16  at 40 C.F.R. § 761, America Unites must show:

17          a.      Building materials at the Malibu Campus contain PCBs, which are

18                  regulated under TSCA; and

19          b.      Defendants are currently engaging in an ongoing use of building

20                  materials containing PCBs at or above 50 ppm or with surface

21                  concentrations above 10 μg/100 cm2 at buildings on the Malibu

22                  Campus in violation of 15 U.S.C. § 2605(e)(2) and 15 U.S.C. § 2614(l)

23                  and its implementing regulation at 40 C.F.R. § 761.20.

24  (Dkt. No. 218-1 at p. 4:18-28.)

25      10.     Among other things, the TSCA prohibits the use of any PCBs in any manner

26  other than in a totally enclosed manner.  15 U.S.C. § 2605(e)(2)(A); see also 40 C.F.R.

27  § 761.20(a) ("No persons may use any PCB, or any PCB item regardless of concentration, in

28  any manner other than in a totally enclosed manner . . . .").

12.     Because America Unites and PEER provided notice to Defendants more than 60 days prior to the filing of this suit, and neither EPA nor the Attorney General has brought any enforcement action regarding PCBs at the Malibu Campus, this action is not precluded by 15 U.S.C. § 2619(b)(1)(A) and (B).

13.     Under the TSCA's "citizen suit" provision, a plaintiff may commence a civil action "to restrain" a violation of the TSCA.  15 U.S.C. § 2619(a)(1).

**D.     A Preponderance of the Evidence Supports the Conclusion that Despite Defendants' Past Remediation Efforts, Building Materials Containing PCBs In Excess of 50 ppm Continue to Exist at the Malibu Campus**

14.     In a separate order, the Court has denied Defendants' Motion for Judgment on Partial Findings.

15.     The results of the testing conducted by the Phylmar Group and Ramboll Environ showed multiple areas in multiple buildings on the Malibu Campus with caulk containing PCBs in excess of the 50 ppm threshold.

16.     Although Defendants have removed and replaced the caulk from the specific areas and rooms identified in their testing as exceeding the 50 ppm threshold, and some other areas may have had doors and windows repaired or replaced after 1979, there is no evidence that all of the caulk in the buildings at the Malibu Campus constructed prior to 1979 has been tested or removed.

17.     The Court concludes, based on common sense, that it is highly likely that the same products were used to construct each of the buildings on the Malibu Campus.  As a result, for the buildings completed at the Malibu Campus prior to 1979, and at which certain locations have been tested and found to contain caulk with PCBs in excess of 50 ppm, it is more likely than not that caulk containing PCBs in excess of 50 ppm remain in "use" at the Malibu Campus in areas that have not been tested or repaired.

18.     As a result of this conclusion, the Court rejects Defendants' argument that the TSCA claim brought by America Unites is moot.

### E.    Appropriate Injunctive Remedy

19.    In its May 8, 2015 Minute Order denying plaintiffs' Motion for Preliminary Injunction, issued just six weeks after this action was filed, the Court highlighted some of the issues that would necessarily guide any injunctive relief the Court might eventually order:

> While the public certainly has a strong interest in providing safe
> school environments, there is also a strong public interest in
> avoiding the confusion and difficulties that would be caused by
> closing areas of MHS and JCES on shortened notice in the midst
> of the school year.  The public also has a strong interest in
> having remediation work performed in a well-planned, careful,
> and cost-effective manner.  The mandatory injunction Plaintiffs
> seek would have the Court interfere in a complex construction
> and environmental remediation process with very limited
> information concerning the associated costs and challenges.  The
> public's interest in an orderly clean-up weighs against the
> granting of a mandatory preliminary injunction.

(Dkt. No. 47.)  Despite this guidance, America Unites failed at trial to present any admissible evidence concerning the costs or amount of time it might take to remove any remaining PCB-containing caulk at the Malibu Campus, or how those removal activities might interfere with the educational mission of MHS and JCES and the scheduling of classes.

20.    Defendants have provided evidence of their plan to replace some of the pre-1979 buildings at the Malibu Campus and replace the windows and doors and associated caulk of the remaining pre-1979 buildings.  According to Defendants, that process will be completed "by 2020."  (Dkt. No. 227 (Maez Test.) at ¶ 12.)

21.    In light of the failure of America Unites to provide any contrary evidence concerning an appropriate construction schedule, the District's continued use of BMPs while

1  potential PCB-containing materials continue to be "used" at the Malibu Campus, and the

2  Court's strong desire to preserve the public's funds, the Court will not require the District to

3  perform costly caulk-removal operations on windows and doors that are already slated for

4  replacement.

5    22. The Court therefore concludes that the appropriate remedy is to enjoin the

6  District and Defendants from using any office, classroom, or other structure at the Malibu

7  Campus constructed prior to 1979 in which students, teachers, administrators, or staff are

8  regularly present after December 31, 2019, unless the window and door systems and

9  surrounding caulk have been replaced.[4/]

10    23. Defendants contend that the primary jurisdiction doctrine bars the claim

11  asserted by America Unites.  The primary jurisdiction doctrine "is applicable whenever the

12  enforcement of a claim subject to a specific regulatory scheme requires resolution of issues

13  that are 'within the special competence of an administrative body.'"  Farley Transp. Co. v.

14  Santa Fe Trail Transp. Co., 778 F.2d 1365, 1370 (9th Cir. 1985) (quoting United States v.

15  W. Pac. R.R., 352 U.S. 59, 64, 77 S. Ct. 161, 165, 1 L. Ed. 2d 126 (1956)).  When the

16  primary jurisdiction doctrine applies, "the judicial process should be suspended and the

17  issues referred to the appropriate administrative body for its views."  Id.  "No fixed

18  formula . . . exists for applying the doctrine, and each case must be examined on its own

19  facts to determine if 'the reasons for the existence of the doctrine are present and whether

20  the purposes it serves will be aided by its application in the particular litigation.'"  Id.

21  (quoting W. Pac. R.R., 352 U.S. at 64, 77 S. Ct. at 165).

22    24. The EPA has said that as a result of the air and wipe sampling for PCBs

23  undertaken at the Malibu Campus, "and the ongoing and future implementation of BMPs

24  and monitoring at MHS and JCES . . . EPA does not believe that there is a need for

25  additional testing of potential PCB source materials until planned renovation or demolition."

26  _____

27  [4/] Defendants shall make every effort to complete the contemplated construction project by December 31, 2019.  However, should construction or other delays slow completion of

28  the construction project and provide good cause, Defendants may, through noticed motion, seek an extension of this deadline.

1  (Dkt. No. 226 (Daugherty Test.) at ¶ 86; Ex. 566 (November 2, 2015 EPA

2  Correspondence).)  Because the District has represented to the Court that it is currently

3  engaged in, and will complete, the type of renovation or demolition that would, as

4  contemplated by the EPA, trigger removal and testing obligations, the injunctive relief

5  contemplated by Court is consistent with the EPA's guidance and expertise.  The Court

6  therefore rejects Defendants' assertion of the EPA's primary jurisdiction as a defense to the

7  claim for injunctive relief pursued by America Unites.

8

9                                                **Conclusion**

10

11         For all of the foregoing reasons, the Court concludes that the preponderance of the

12  evidence supports the conclusion that PCB-containing materials are in "use" at the Malibu

13  Campus.  Because the District's current plan to replace and renovate the pre-1979 buildings

14  on the Malibu Campus is a reasonable and appropriate remedy for the TSCA violation, the

15  Court will enter a permanent injunction that is consistent with the District's construction

16  plan.  PEER is dismissed for lack of standing.  The Court will issue a Judgment and

17  Permanent Injunction consistent with these Findings of Fact and Conclusions of Law and the

18  Court's December 21, 2015 Minute Order concerning sanctions.  (Dkt. No. 76.)

19  DATED: September 1, 2016

20                                                _____

21                                                       Percy Anderson
                                                  UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28